1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARCUS L. HARRISON,

        Plaintiff,

  v.

INSTITUTIONAL GANG OF
INVESTIGATIONS; et al.,

        Defendants.

                               /

No. C 07-3824 SI (pr)

**ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

### INTRODUCTION

Marcus L. Harrison, a California prisoner, filed this pro se civil rights action under 42 U.S.C. § 1983 asserting a First Amendment claim regarding the confiscation of some of his outgoing and incoming mail. Defendants moved for summary judgment and plaintiff opposed the motion. For the reasons discussed below, defendants' motion for summary judgment will be denied.

### BACKGROUND

Harrison alleged in his complaint that Pelican Bay officials violated his First Amendment rights by misapplying the prison regulations and confiscating incoming and outgoing mail pertaining to, among other things, the Black August memorial, the New Afrikan Collective Think Tank, the George Jackson University and the New Afrikan Institute of Criminology 101. Complaint, p. 6. Defendants do not deny that Harrison's outgoing mail was confiscated, but contend that the confiscation was permissible because the materials confiscated pertained to

events and organizations affiliated with the Black Guerilla Family, a prison gang of which Harrison is a member. Harrison denies that the materials are gang-related and urges that the entities and organizations discussed exist "to promote educational, social, cultural, [and] political awareness from the viewpoints of the New Afrikan." Complaint, p. 8.

The following facts are undisputed unless otherwise noted.

Harrison has been validated as a member of the Black Guerilla Family prison gang ("BGF"). As a result of his validation, he is housed in the security housing unit at Pelican Bay indefinitely.

Defendant Devan Hawkes is a correctional counselor II, specialist at Pelican Bay. He investigates gang activity, develops and implements gang management strategies, and answers appeals filed by inmates. He also assists in the classification of gang affiliates for housing and programming at the prison. Defendant G. Stewart is a correctional counselor I in the SHU at Pelican Bay. Both defendants are part of Pelican Bay's institutional gang investigations unit.

A.    The BGF Prison Gang

The "primary goal of prison gangs, which are highly organized entities that have a clear power structure, is to undermine the safety of individuals inside and outside of the prison." Hawkes Decl., ¶ 6. As a result of intelligence gathered over the years, prison officials have obtained information about the BGF and certain other entities. Hawkes stated the following about BGF: "The BGF is a prison gang that arose out of a 1960's movement co-founded by George Jackson. At the time that the gang was established, one of its stated goals was the overthrow of the United States government. The gang established the 'Black August' observance to honor deceased members of both the Black Movement and the BGF. Black August is observed by both present and former BGF members and is promoted by BGF affiliates (ex-felons) residing in the community. During Black August, members of the BGF advocate retaliation against correctional officers and others for the deaths of BGF 'comrades' who have allegedly been murdered by prison officials." Hawkes Decl., ¶ 7. Black August has 31 days of

2

fasting with days of particular importance for deceased Black Movement and BGF members, several of whom were prisoners allegedly killed by correctional staff.

The prison's gang investigations unit has, through interviews with inmates and confiscation of materials, learned about connections between the BGF and other entities.

> [The unit] has learned that the gang is attempting to use other groups and entities as "cover" to lend respectability to the BGF, and facilitate communication between BGF affiliates. For example, former BGF members have reported that the New Afrikan Revolutionary Nationalist, New Afrikan Collective Think Tank, the George Jackson University, and the New Afrikan Institute of Criminology 101 are entities that promote the BGF. References to those entities have been found in both the cells of BGF members and among the community contacts that are associated with BGF members.

Hawkes Decl., ¶ 9.

Hawkes also described information his gang investigations unit had learned about the dragon's symbolism for the BGF.

> The testimony of former BGF members indicates that the dragon is a symbol of the BGF. That testimony is supported by documents discovered in the cells of BGF members and associates. For example, BGF members refer to Jeffrey Gaulden as 'Joka Khatari.' The term 'Joka' means 'dragon' in Swahili. Furthermore, a BGF cadre reserved for the upper ranks of the gang is called the 'Joka' or 'Dragon' cadre, and images of a dragon wrapped around a tower are among several tattoos and emblems recognized by the BGF.

Id. at ¶ 10.

Based on materials obtained from BGF members by prison officials, defendants believe that the BGF is committed to an armed revolutionary struggle against the California Department of Corrections and Rehabilitation. Defendants point out that in one document, a BGF member described himself as an "extremist," called for "extreme measures to solve extreme problems," and urged that "by no stretch of the imagination can we hope to overthrow so determined an enemy without force." Motion, p. 4, citing Complaint, Ex. B. However, this was not a document in Harrison's mail, but rather was a document obtained in 1992 that was among the materials that prison officials had seen that led them to their conclusions about BGF's danger.

B.    Regulations Related to Prison Gangs and Inmate Mail

The California Code of Regulations defines a "prison gang" as any gang with its roots or origins within the CDCR or any other prison system. 15 Cal. Code Regs.§ 3000. A primary

goal of prison gangs is to undermine the safety of individuals inside and outside of the prison. Decl. D. Hawkes ¶ 6. "Inmates and parolees shall not knowingly promote, further or assist any gang as defined under section 3000." 15 Cal. Code Regs. § 3023(a). An inmate qualifies for an indeterminate term in a SHU if he is a validated member or associate of a prison gang. Decl. D. Hawkes ¶ 6.

The regulations prohibit mailing gang-related materials and other contraband. 15 Cal. Code Regs. §§ 3006, 3136. Any material reasonably deemed to be a threat to a legitimate penological interest is classified as contraband. Id. at §3006(c)(16). The regulations direct prison staff not to permit an inmate to send or receive mail which, in their judgment, has any characteristics listed in section 3006(c). Id. at § 3136(a).

C.    Harrison's Confiscated Mail and Administrative Appeals

Several items were seized by prison officials from Harrison's outgoing mail: (1) three manila envelopes containing five type-written pages pertaining to Black August addressed to Kathleen Cleaver, Prison & Parole Studies Project and Friends of Marilyn Buck; (2) two letters regarding Black August addressed to Black Brigade and Voices in Black Newsletter; (3) a letter promoting the New Afrikan Revolutionary Nationalism, the New Afrikan Collective Think Tank, and the New Afrikan Institute of Criminology addressed to Coalition Against Police Abuse and (4) one manila envelope containing a drawing of a dragon addressed to "My Favorite Lil Sista C/O Hannah Bastienne." Compl., Exs. A-D.

Prison officials also intercepted some incoming mail to Harrison, apparently including an envelope containing pictures of George Jackson, Joanne Chesimard (also known as Assata Shakur), Malcolm X, Nat Turner, and others, which Harrison had previously sent out for copying. Compl., Ex F. The exhibit indicates that the mail eventually was delivered to Harrison after he filed an inmate appeal. Id. It is unclear from the exhibit whether there was other mail that was not delivered to Harrison.

After intercepting Harrison's mail, prison officials issued a "notification of disapproval -

4

mail/packages/publications" that explained why the materials were being withheld.  See, e.g., Compl., Ex. B.  A "gang information chrono" was also issued which stated that Pelican Bay's institutional gang investigations unit had reviewed the relevant mail,  and that the promotion of Black August, the New Afrikan Collective Think Tank, the George Jackson University and the New Afrikan Institute of Criminology 101 in those materials demonstrated Harrison's active affiliation with the BGF prison gang.  Id.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred at Pelican Bay State Prison in Del Norte County, which is located within the Northern District.  See 28 U.S.C. §§ 84, 1391(b).  This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, when a party challenges the merits of the opponent's claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence

5

of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). The complaint was made under penalty of perjury and therefore is considered as evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. Id. at 631.

## DISCUSSION

"'[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" Pell v. Procunier, 417 U.S. 817, 822 (1974) (citing Price v. Johnston, 334 U.S. 266, 285 (1948)). Prisoners retain those First Amendment rights not inconsistent with their status as prisoners or with legitimate penological objectives of the corrections system. Id. In evaluating a mail confiscation claim, the court applies two slightly different tests – the test used for restrictions on outgoing mail is slightly more difficult for prison officials than the test used for restrictions

1   on incoming mail.[1]

2       A limitation on *outgoing* mail is justified only if the limitation in question (1) "furthers

3   an important governmental interest unrelated to the suppression of expression," and (2) is "no

4   greater than necessary or essential" to protect the governmental interest involved. <u>Procunier v.

5   Martinez</u>, 416 U.S. 396, 413 (1974), overruled on other grounds by <u>Thornburgh v. Abbott</u>, 490

6   U.S. 401, 413-14 (1989); <u>Barrett v. Belleque</u>, 544 F.3d 1060, 1062 (9th Cir. 2008).

7       As to *incoming* mail, a regulation or practice limiting prisoners' receipt of mail is valid

8   if it is reasonably related to legitimate penological interests. <u>Thornburgh</u>, 490 U.S. at 413 (citing

9   <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)); <u>see also</u> <u>Crofton v. Roe</u>, 170 F.3d 957, 959 (9th Cir.

10  1999).  Four factors are to be considered when determining the reasonableness of a prison rule:

11  (1) whether there is a "valid, rational connection between the prison regulation and the legitimate

12  governmental interest put forward to justify it," (2) "whether there are alternative means of

13  exercising the right that remain open to prison inmates," (3) "the impact accommodation of the

14  asserted constitutional right will have on guards and other inmates and on the allocation of

15  prison resources generally," and (4) the "absence of ready alternatives", or, in other words,

16  whether the rule at issue is an "exaggerated response to prison concerns." <u>Turner</u>, 482 U.S. at

17  89-90.

18      Prison officials are not required to show with certainty that any particular correspondence

19  would have adverse consequences because they are given some latitude in anticipating the

20  probable consequences of allowing a certain speech in and out of a prison environment.

21  <u>Procunier v. Martinez</u>, 416 U.S. at 414; <u>see also</u> <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003)

22  (courts owe "substantial deference to the professional judgment of prison administrators.")

23      This court's ability to evaluate the merits of this case is hampered by the fact that neither

24  party has put in the record the particular documents that were confiscated – if those documents

25  still exist.   Plaintiff submitted some documents that may or may not be the confiscated

26

27  _____

28      [1]Defendants contend that the regulations pertaining to the confiscation of the mail were
    proper.  Plaintiff does not challenge the regulations, however, so there is no need for the court
    to evaluate the regulations in this action.  <u>See</u> Opposition, pp. 3-4.

documents, see Complaint, Ex. A, but largely the court must rely on the parties' descriptions of the documents to do its analysis.

A.      Outgoing Mail

Confiscation of outgoing mail must further an important or substantial governmental interest unrelated to the suppression of expression. Procunier v. Martinez, 416 U.S. at 413; see, e.g., id. (refusal to send letters concerning escape plans or proposed criminal activity would be an obvious example of justifiable censorship).[2]  Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Id. Procunier v. Martinez upheld the lower court's decision that invalidated several regulations regarding outgoing mail, specifically, regulations that allowed "censorship of statements that 'unduly complain' or 'magnify grievances,' *expression of 'inflammatory political, racial, religious or other views,'* and matter deemed 'defamatory' or 'otherwise inappropriate.'" 416 U.S. at 415 (emphasis added).  The Court determined that the prison officials "failed to show that these broad restrictions on prisoner mail were in any way necessary to the furtherance of a governmental interest unrelated to the suppression of expression." Id. With respect to the regulation allowing censorship of the expression of inflammatory views, the Court  rejected prison officials' contention that such "'matter clearly presents a danger to prison security.' . . . The regulation, however, is not narrowly drawn to reach only material that might be thought to encourage violence nor is its application limited to incoming letters." Id. at 416.  Once the government interest allegedly being protected by the limitation on outgoing mail is identified, then one must consider whether the limitation is no greater than necessary to protect that interest.  A tighter fit between governmental interest and the limitation imposed is required for outgoing

---

[2]The Supreme Court listed with approval certain kinds of outgoing mail that reasonably might be disallowed: (1) that which might violate postal regulations, e.g., threats, blackmail, or contraband; (2) that which indicates a plot to escape; (3) that which discusses criminal activities; (4) that which indicates that the inmate is running a business while he is in confinement; or (5) that which contains codes or other obvious attempts to circumvent legitimate prison regulations. 416 U.S. at 414 n.14.

1   mail than incoming mail because outgoing mail generally has less serious implications on prison

2   security than incoming mail due to the fact that, by its nature, outgoing mail typically does not

3   pose a serious threat to internal prison order and security.  See Thornburg v. Abbott, 490 U.S.

4   401, 411-13 (1989).

5       Defendants have the burden to prove that the confiscation furthered an important

6   government interest and to prove that the confiscation of materials was no greater than necessary

7   to protect that interest.  Cf. Beard v. Banks, 548 U.S. 521, 530-34 (2006) (putting burden on the

8   state to show penological interest, and connection between the limitation and the penological

9   objective when Turner, 482 U.S. 78, applies); Armstrong v. Davis, 275 F.3d 849, 874 (9th Cir.

10  2001) ("To satisfy Turner, the Board must, at the very least, adduce some penological reason for

11  its policy at the relevant stage of the judicial proceedings.")

12      Defendants contend that they confiscated the outgoing mail at issue because it posed a

13  threat to the interests of preserving security and order at the prison.  The threat is based on the

14  connection between the BGF prison gang and the subject matter of the pieces of mail.

15  Defendants presented evidence that Black August is observed and promoted by BGF, and is a

16  time during which BGF members advocate retaliation against correctional officers and others.

17  Defendants presented evidence that the New Afrikan Revolutionary Nationalist, the New

18  Afrikan Collective Think Tank, the George Jackson University and the New Afrikan Institute

19  of Criminology promote the BGF.  Defendants presented evidence that the dragon is a symbol

20  of the BGF.  See Decl. D. Hawkes  ¶¶ 7-10.

21      Defendants have failed to meet their burden to show that the confiscation of Harrison's

22  outgoing mail was no greater than necessary to protect the asserted interest of prison security and

23  safety.  Defendants do not contend that the intended recipients were in the BGF, or that the

24  confiscated mail contained any coded message, or that the confiscated mail actually advocated

25  violence. Defendants urge the mail was properly confiscated because it promoted BGF's "armed

26  revolutionary struggle" against the CDCR.  Defs.' Mot. Summ. J. 9:21-22.  Defendants take a

27  very expansive view of what might "promote" a prison gang's illicit activities and apply it with

28

gusto, while the First Amendment requires a more nuanced approach.[3]

Defendants appear to contend that a categorical ban on things related to Black August is proper, as they have not identified any particular statement about Black August in Harrison's mail that actually "might be thought to encourage violence." Procunier v. Martinez, 416 U.S. at 416. Black August commemorates some people who prison officials may not think are worthy of commemorating, but the defendants have not made an adequate showing of such a close connection between the BGF and Black August that the court could find it undisputed that mail pertaining to Black August actually presented a danger to prison security or actually encouraged violence. The parties disagree whether Black August was started by the BGF, and even defendants state that Black August honors deceased members of "both the Black Movement and the BGF." Hawkes Decl., ¶ 7.

Defendants' showing is even less convincing with regard to the confiscation of materials pertaining to the New Afrikan Collective Think Thank, the New Afrikan Institute of Criminology 101, and the George Jackson University. Harrison presents evidence that "the central focus & objective of the Black August memorial, the New Afrikan Collective Think

---

[3]A review of published circuit cases both upholding and rejecting censorship indicates that the courts closely examine the fit between asserted penological interest and the particular outgoing mail being censored, rather than accept at face-value an assertion by prison officials that the confiscation serves security or rehabilitation interests. Cases upholding censorship of outgoing mail include Morgan v. Quarterman, 570 F.3d 663, 667 (5th Cir. 2009) (penological interest in rehabilitation justified disciplining inmate for sending vulgar note to opposing counsel, so it was not an impermissible infringement of his First Amendment rights); Koutnik v. Brown, 456 F.3d 777, 785-86 (7th Cir. 2006) (no First Amendment violation; confiscation of prisoner's mail to merchandising company urging it to add communist-themed posters to its product line and enclosing drawing of swastika with cell bars that had anti-corrections department slogan on ground that it had a gang symbol (i.e., the swastika) furthered important interest in rehabilitation); Nasir v. Morgan, 350 F.3d 366, 375-76 (3d Cir. 2003) (ban on outgoing mail to former prisoners did not violate prisoner's First Amendment rights); and Leonard v. Nix, 55 F.3d 370, 374-76 (8th Cir. 1995) (no First Amendment violation in disciplinary action taken against prisoner for writing scurrilous comments about warden in letter to former inmate but intended to be read by prison staff). Cases finding constitutional violation in censorship of outgoing mail include Loggins v. Delo, 999 F.2d 364, 367 (8th Cir. 1993) (discipline imposed for outgoing mail that had offensive comments about mailroom clerk violated prisoner's First Amendment rights because the offensive language did not implicate prison security concerns); and McNamara v. Moody, 606 F.2d 621, 624 (5th Cir. 1979) (refusal to mail prisoner's letter in which he wrote to his girlfriend that prison officer had sex with a cat; court recognized that the statements were coarse and offensive but rejected prison guard's argument that allowing such mail would lead to a "total breakdown" in prison security).

Thank (N.A.C.T.T.), the New Afrikan Institute of Criminology 101 (N.A.I.C.) etc. is to promote educational social, cultural, & political awareness from the viewpoints of the new Afrikan." Complaint, p. 8. Defendants respond that, even if that is true, "it is a 'social, political and cultural' movement that promotes the BGF" and they therefore were justified in withholding Harrison's mail concerning those groups. Reply, p. 2. Defendants think that BGF uses organizations such as these "as 'cover' to lend respectability to the BGF, and facilitate communication between BGF affiliates," Hawkes Decl., ¶ 9, but they do not identify any of these entities as having the anti-prison authority outlook that Black August does, let alone that any of these entities advocate violence against prison officials. Most importantly, defendants do not identify any particular statement in these mailings that actually might be thought to encourage violence. In light of Harrison's plausible statements that these groups promote social, cultural and political awareness from a "New Afrikan" perspective, plus defendants' statement that they are used as cover to give the gang respectability, plus the absence of a showing of the particular evils of any of these groups, there is a concern of the possibility that defendants may have taken a race-based shortcut and assumed anything having to due with African-American culture could be banned under the guise of controlling the BGF. Cf. Richardson v. Runnels, No. 07-16736, slip op. 1433, 1442-44 (9th Cir. Jan. 26, 2010).

Defendants' showing is least convincing with regard to their confiscation of the outgoing mail that had a drawing of a dragon on it. The court defers to prison officials' professional judgment that it was a BGF gang-related symbol, even though Harrison claims it was not a BGF symbol. See Koutnik, 456 F.3d at 785 (deferring to prison officials' determination that a drawing of swastika was a gang-related symbol). Doing so does not resolve the matter because defendants have not identified how the drawing itself might be thought to encourage violence.

It is not in doubt that prison gangs present a danger to prison safety and security, and that limiting the activities of these gangs serves an important governmental interest. While prison officials may well be able to ban possession of the materials within the prison, the particular

11

challenge here is to the censorship of the mail as it left the prison, at which point the interests of the recipients become a consideration. <u>See</u> <u>Procunier v. Martinez</u>, 416 U.S. at 407-09. Even giving substantial deference to prison officials' professional judgment, the court cannot conclude, as a matter of law, that there was a sufficiently tight fit between the security interest and confiscation of these particular pieces of mail to make the confiscation constitutionally permissible. The motion must be denied with respect to the outgoing mail.

B.      <u>Incoming Mail</u>

Defendants do not argue that they were entitled to summary judgment with regard to the confiscation of the incoming mail. In fact, they state that it is "unclear what, if any, incoming mail was withheld by prison officials." Motion, p. 5. The confiscation of incoming mail was alleged in the complaint, and Harrison filed an inmate appeal regarding it, <u>see</u> Complaint, Ex. F, but the facts related to any confiscation of incoming mail are not at all clear. Since the record is sufficiently undeveloped as to what happened, and defendants failed to present any argument that they were entitled to summary judgment on this claim by Harrison, the motion is denied with respect to the incoming mail.

C.      <u>Qualified Immunity</u>

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. The court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Id.</u> at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. <u>See id.</u> If, however, "a violation could be made out on a favorable view of the parties'

12

submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Although Saucier required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case. See Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

Here, Procunier v. Martinez provides the relevant clearly established law on a prisoner's First Amendment rights vis-a-vis outgoing mail. It was clearly established that the confiscation of Harrison's outgoing mail would have been justified only if it (1) "further[ed] an important governmental interest unrelated to the suppression of expression," and (2) was "no greater than necessary or essential" to protect the governmental interest involved. Procunier v. Martinez, 416 U.S. at 413. Taken in the light most favorable to Harrison, the facts alleged would allow a reasonable jury to find a violation of his First Amendment right to send mail, as discussed in the section above rejecting defendants' argument that they are entitled to judgment as a matter of law on the merits of Harrison's claim.

Defendants urge that they are entitled to qualified immunity because, even if their conduct was found to be unconstitutional, it would not have been clear to a reasonable prison officer that such conduct was unlawful because they were acting in accord with the California Code of Regulations. However, the state regulations do not establish the existence or scope of the federal constitutional right and existing case law would suggest that compliance with state regulations – such as the broad ones here which allowed confiscation of any outgoing mail that had anything deemed contraband within the prison – would not shield a prison official from liability for constitutional violations. See generally Cousins v. Lockyer, 568 F.3d 1063, 1070 (9th Cir. 2009) (CDCR operations manual describing duties that, if performed, would have avoided the alleged

13

1   wrong to plaintiff, were irrelevant to qualified immunity inquiry because they did not establish

2   a federal constitutional right); California Attorneys for Criminal Justice v. Butts, 195 F.3d 1039,

3   1049-50 (9th Cir. 2000) (denying qualified immunity to defendants who interrogated suspects

4   in violation of Miranda, notwithstanding training material permitting such interrogations and

5   Supreme Court opinions allowing the use of such interrogations for impeachment). Defendants

6   are not entitled to judgment in their favor on the qualified immunity defense.

7

8                                            **CONCLUSION**

9          For the foregoing reasons, defendants' motion for summary judgment is DENIED.

10  (Docket # 38.) No later than **April 2, 2010**, the parties must file and serve case management

11  reports indicating what discovery remains to be done, the amount of time needed for discovery,

12  whether any further motions will be filed, when they will be ready for trial, and the expected

13  length of the trial. The statements need not be jointly prepared.

14         Defendants must file and serve an answer to the complaint no later than **April 2, 2010**.

15  See 42 U.S.C. § 1997e(g)(2).

16         IT IS SO ORDERED.

17  Dated: February 22, 2010

18                                                   SUSAN ILLSTON
                                                     United States District Judge

19

20

21

22

23

24

25

26

27

28